HAROLD GIMBEL ET AL. *v.* EUGENE S. LOUGHLIN ET AL.

SUPERIOR COURT     NEW HAVEN COUNTY     FILE No. 115540
AT NEW HAVEN

Memorandum filed April 22, 1968

*Sachs, Sachs, Giaimo & Sachs,* of New Haven, for the plaintiffs.

*Wiggin & Dana,* of New Haven, for the defendant The United Illuminating Company.

*Robert K. Killian,* attorney general, and *John K. Jepson,* assistant attorney general, for the defendants Eugene S. Loughlin et al. (Public Utilities Commission).

FITZGERALD, J. This is an appeal by four individuals, all residents of the town of Woodbridge, from a finding and order issued by the public utilities commission on October 30, 1967, approving an application by The United Illuminating Company for permission to construct a two-circuit 115 KV electric transmission line from the site of a new substation to be constructed at June Street and Hazel Terrace in the town of Woodbridge to a connection with an existing transmission line near Pease Road in that town. The site of the substation and the plan for such a structure were approved by the Woodbridge town plan and zoning commission in 1966 pursuant to its power under § 16-235 of the General Statutes. No appeal from that decision was taken by any person to the public utilities commission as permitted by the statute, and, accordingly, no issues regarding the substation are involved on the present appeal. Similarly, no issues are presented in this case regarding acquisition of the necessary right of way for the line, amounting to approximately 4100 feet, since the utility acquired the necessary property by purchases without employment of its power of eminent domain. Cf. *Connecticut Power Co. v. Powers*, 142 Conn. 722 (1955).

In approving the application for construction of the transmission line, the commission acted pursuant to § 16-243 of the General Statutes, which grants to it exclusive jurisdiction "over the method of construction or reconstruction" of "wires, poles, conductors and fixtures" for the transmission of electricity. Plaintiffs do not challenge the existence of such an exclusive jurisdiction in the commission, and they have admitted that a full and fair public hearing in which they were afforded every reasonable opportunity to participate was held by the commission before entering its order.

In their complaint, plaintiffs specify five respects in which they allege that the commission "acted illegally, arbitrarily and unreasonably and exceeded or abused the statutory power and authority conferred upon it." The last of these claims challenges the failure of the commission to require that the transmission line be constructed underground; the third claim alleges that the commission failed to consider "the adverse effect upon the area" in approving the application for overhead construction of the line; and the remaining three claims all relate to plaintiffs' contention that the commission did not require the applicant to make and present sufficient studies regarding the cost of installing the line underground. Only this last contention was mentioned in plaintiffs' brief, where they state their claim as follows: "The plaintiffs do not deny the authority of the commission to permit the construction of such overhead lines after requiring and hearing adequate evidence thereon. It is the position of the plaintiffs, however, that the commission acted unlawfully in permitting such construction without first having before it sufficient evidence as to alternative methods of installation."

Neither before the commission nor on this appeal have plaintiffs suggested that the route of the approved transmission line is other than the shortest and most practical one feasible, and they have not challenged the commission's finding that construction of the line is necessary to provide the bulk electric power supply required for the utility applicant to continue furnishing adequate and reliable electric service to a rapidly growing portion of its franchise area.

The jurisdiction of the court over this appeal is conferred by § 16-35 of the General Statutes; § 16-37 thereof specifies the procedure on such an appeal.

In *Anthony Augliera, Inc.* v. *Loughlin,* 149 Conn. 478, 481-2 (1962), the scope of review and the procedure on such an appeal were summarized by our Supreme Court as follows: "Under § 16-37, the court reviews, on a certified record, the proceedings of the commission, examines the legality of the order, authorization or decision appealed from and its propriety and expediency so far as the court has cognizance of the subject, and proceeds in the same manner as on complaints for equitable relief. The court cannot substitute its discretion for that legally vested in the commission but determines on the record whether there is a logical and rational basis for the decision of the commission or whether, in the light of the evidence, it has acted illegally or in abuse of its discretion. A plaintiff has the burden of proof as to the existence of any abuse."

In *Rockville* v. *Public Utilities Commission,* 146 Conn. 1, 5 (1958), it was held that "[u]pon such an appeal, the only question before the court is whether the commission acted illegally or in excess or abuse of its powers"; and in the absence of a finding the desirability that the reviewing court specify in its memorandum "the legal conclusions upon which it based its judgment" was indicated. See, also, *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 252 (1958); *Kram* v. *Public Utilities Commission,* 126 Conn. 543, 550 (1940).

Only aggrieved persons may appeal under § 16-35 of the General Statutes; and the defendants in their answers have denied the plaintiffs' allegations of aggrievement. Upon the hearing of this appeal the court, relying on the analogy of the procedure followed upon appeals from certain other administrative agencies (see *I. R. Stich Associates, Inc.* v. *Town Council,* 155 Conn. 1 [1967]; cf. *Maloney* v.

*Taplin,* 154 Conn. 247 [1966], over the objection of counsel for the commission permitted the plaintiffs to introduce evidence claimed by them to support their status as aggrieved persons. The testimony of the plaintiff Gimbel disclosed that he claims aggrievement as a result of the commission's order based on his ownership at the time of the court hearing (February 21, 1968) of an option to purchase certain property adjoining the right of way of the transmission line, on which property he hopes to build a large motel. It appears that the option in question, the grantee of which is "Investment Associates, Inc.," and not the plaintiff Gimbel, had not been fully executed at the time of the hearing before the commission and that it had not even been partially executed until more than two months subsequent to the filing with the commission of the application for approval to construct the transmission line.

The three other plaintiffs are owners of residences on the only highway crossed by the line throughout its entire distance of approximately 4100 feet. The two that testified admitted that each of their reasons for objecting to the overhead construction of the transmission line had been submitted to the commission and rejected by it. As discussed in more detail hereinafter, a review of the entire record clearly discloses that the commission acted well within its discretion in rejecting each of these plaintiffs' claims since they produced no evidence to support their claims and there was substantial evidence to the contrary. The court is impelled to conclude that none of the plaintiffs have established that their individual interests are sufficiently affected adversely by the commission's order to make them aggrieved parties within the meaning of § 16-35. In view, however, of the obvious public interest in facilitating an expeditious resolution of this litiga-

tion, the court will, despite the foregoing conclusion, assume that at least one of the plaintiffs is sufficiently aggrieved by the commission's order to warrant consideration by the court of the merits of the appeal.

As previously noted, the only claim pressed by the plaintiffs in their brief is "that the commission acted unlawfully in permitting such construction without first having before it sufficient evidence as to alternative methods of installation." Plaintiffs' abandonment of other claims is shown by their statement at the conclusion of their brief of the specific relief they now request on this appeal, to wit, that the court vacate and set aside the commission's order and direct the commission "to institute supplementary proceedings after necessary and proper tests to determine the actual cost to the United Illuminating Company of locating the said high voltage transmission lines under the ground, and after a study of other alternatives or other methods of connecting the power flow, and by ordering such other and further relief as this court shall deem proper."

A demonstration that the apparently abandoned claims were without any merit does not require an extended discussion. In delegating exclusive jurisdiction over the construction and reconstruction of facilities for the transmission of electricity to the public utilities commission (§ 16-243), the General Assembly obviously recognized the desirability that an agency with statewide jurisdiction and with expertise in the field have exclusive power and responsibility in such area. The wisdom of this decision by the General Assembly is apparent when one notes some of the problems that have arisen in other jurisdictions which had statutes which did not delineate as clearly as does § 16-243 the allocation of responsibility in this area. See *Deen* v. *Baltimore*

*Gas & Electric Co.,* 240 Md. 317 (1965) ; *In re Public Service Electric & Gas Co.,* 35 N.J. 358 (1961) ; *Cleveland Electric Illuminating Co.* v. *Painesville,* 10 Ohio App. 2d 85 (1967) ; *Duquesne Light Co.* v. *Upper St. Clair Township,* 377 Pa. 323 (1954).

In its carefully drawn order, the commission expressly rejected plaintiffs' claims that construction of the transmission line overhead as proposed in the application would create an unsafe condition for children, interfere with plaintiffs' television and radio reception, lower the values of their properties and destroy the beauty of the adjoining countryside. The commission noted that "no credible evidence was adduced to support these claims" and that there was affirmative evidence submitted contradicting each such contention. A review of the record shows, for example, that the commission had the benefit of a study published in 1965 by the Institute of Urban Research of the University of Connecticut entitled "Transmission Line Rights of Way and Residential Values," which study concludes (p. 118) that "the value of most residential properties is neither appreciably nor measurably affected adversely by adjacency to, or intersection by, overhead electric transmission line rights of way." The commission also had the benefit of an examination of the route of the proposed line by members of the commission's engineering staff. The commission specifically found that the overhead lines will not "so extensively mar the present natural beauty as to destroy this beauty" of the area and that "safety precautions taken by the power company, under regulations of this commission and such federal regulations as are pertinent, are as near accident-proof as can be reasonably expected." Each of these conclusions of the commission is fully supported by the record and in reaching such conclusions it did not act illegally or in abuse of its discretion.

Plaintiffs' claim that the commission should have required the applicant to undertake further studies is obviously closely related to its abandoned contention that the commission acted illegally in not requiring that the transmission line be constructed underground. In the course of reaching its decision that, taking into account "considerations of reliability of service and cost," the line "should be constructed where proposed, and overhead rather than underground," the commission found: "The cost of underground installation would be multiples of the cost of overhead installation and would have a marked unfavorable impact on rates charged the consumers. . . . In balancing the increased multiple cost of underground construction against the considerably lesser cost of overhead construction as proposed here, with its minimal interference with other public conveniences and aesthetic enjoyments, and the fact that whether this line is put overhead or underground it will be necessary to remove the same trees and shrubs, leads to the inevitable conclusion that the proposal herein represents the only reasonable and practical way of serving the public convenience and necessity in the present situation, and the application should be, and hereby is, approved."

Plaintiffs contend that the only evidence before the commission regarding the cost of undergrounding was conjectural, that there are conflicts between various parts of the testimony as to such cost, and that the commission accordingly should have required that additional studies be made. Plaintiffs claim support for this contention from the fact one commissioner filed a dissent from the order in which he stated his view that "[w]e cannot afford to destroy our natural aesthetic resources unless there is no alternate method, determined after a thorough

study by the Utility, which was not made in this case."

The commission's findings regarding the comparative costs of constructing the transmission line underground as opposed to overhead are abundantly supported by the evidence before it. Not only did applicant submit detailed testimony by a qualified engineering expert regarding its estimates of the costs of overhead and underground construction but there was entered in evidence a copy of the report submitted in April, 1966, to the federal power commission by its advisory committee on underground transmission, which report contains a detailed analysis of comparative costs. The court notes that the report concluded (p. 28) that "for average conditions" in suburban areas "underground lines cost about nine times as much as overhead lines at 138,000 volts and 16 times as much at 345,000 volts" and that in rural areas the cost differences are even greater. While the two lines involved in the application will each operate at 115,000 volts, it is clear that the cost ratio between overhead and underground construction would be close to that stated for a 138,000 volt line. Plaintiffs' complaint regarding the conjectural nature of some of the cost figures presented to the commission is not well taken. It is obvious that any cost figures submitted in connection with such an application must be estimates and any estimate involves assumptions regarding various conditions which may be encountered when the job is actually performed. In the present case, the photographs in evidence show that the transmission line must scale a rocky incline at its substation end, and there was evidence that such a condition undoubtedly would increase the cost of undergrounding above that expected under "average" conditions.

Plaintiffs' contention that there were conflicting cost estimates is similarly unfounded. An analysis of the record shows that the figures cited by plaintiffs as being in conflict were not submitted as different estimates for identical service. Rather applicant indicated that, if it were required to build the line underground, it would not necessarily build a line of the same capacity as it sought permission to construct overhead. Rather it might attempt to get by with a less satisfactory facility, and the lower set of underground cost estimates therefore are for a line that is not the equivalent in either capacity or reliability of service to the approved project. In any event, since the cost of even such lesser facility underground clearly would be several times the cost of the approved construction, no reasonable purpose could be served by obtaining a more precise estimate.

Even absent the abundant specific evidence in the record supporting the commission's conclusion that "the increased multiple cost of underground construction" is not warranted in the present case, the court concludes that it would not have constituted an abuse of discretion for the commission to approve overhead construction of the line. The matter of relative cost, safety, and reliability of overhead and underground transmission lines is a subject peculiarly within the special competence of the commission. The court is aware that the commission has had considerable experience in this area as well as having available to it findings of similar boards dealing with comparable issues in other jurisdictions. See, e.g., *Re Hartford Electric Light Co.,* 64 P.U.R.3d 394 (Conn. 1966); *Re Baltimore Gas & Electric Co.,* 64 P.U.R.3d 473 (Md. 1966); *Woodside* v. *Pacific Gas & Electric Co.,* 57 P.U.R.3d 209 (Cal. 1965). An administrative agency such as the public utilities commission is fully justified in relying on

its own experience and such published reports in exercising the discretion delegated to it by the General Assembly. See *Blakeman* v. *Planning Commission,* 152 Conn. 303, 307 (1965); *Jaffe* v. *State Department of Health,* 135 Conn. 339, 349 (1949); see also *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 675 (1954).

Plaintiffs have also called the court's attention to the issuance by the commission subsequent to the date of the order being reviewed of a notice which states that, "[i]n furtherance of its statutory responsibilities, the commission will conduct an investigation into the technical and economic feasibility of underground electric transmission and distribution and underground facilities," and public hearings are being held pursuant to such notice. It is quite clear that such an investigation was not intended to limit in any respect the order being reviewed. As stated in the brief filed in this court on behalf of the commission, "[t]he fact that the Commission continues to meet its responsibility of keeping informed, far from being deemed arbitrary and capricious, must be considered the appropriate pursuit of its duty." The court agrees that this evidence of continued study by the commission of this subject, over which it has regulatory responsibility, rather than in any manner undermining the commission's order, confirms that the respect required by law to be given to that order is thoroughly justified in fact.

Since the commission's finding and order have been found to be fully supported by the record, it may be superfluous to add that the ruling plaintiffs seek would also be unsustainable as a matter of law. Plaintiffs have not contested the commission's finding that they "offered no practical, acceptable alternative" to applicant's proposal, and it is quite

clear from the record that plaintiffs' only specific suggestion was that the line should be required to be built underground. In *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 260 (1958), our Supreme Court stated, in rejecting an analogous contention: "Even if the Stamford site was available, it cannot be said as a matter of law that the commission was arbitrary and unreasonable in approving the Manresa site. But there was no proof offered that the Stamford site was available, and the burden of establishing this fact rested upon the plaintiffs. *Kram* v. *Public Utilities Commission,* 126 Conn. 543, 548 . . . . They argue that since the defendant was seeking the approval of the commission, it should establish that the Stamford site was not available once it was proposed. That might be true if the burden was upon the defendant to prove that every other available site was considered and that Manresa Island was the only one suitable for the defendant's purposes, but no such burden rested upon it. Rather, the burden was upon the plaintiffs to establish, if they could, that the defendant should be denied the site on Manresa Island because there were other, and superior, sites which could be obtained."

Our Supreme Court subsequently restated this proposition as follows (145 Conn. at 262): "Manifestly, it is not necessary that justification for the action of the commission rest upon a finding that there is no alternative. It is enough if, in the deliberate, carefully considered judgment of the commission, the site approved serves the public convenience and necessity better than any alternative offered." The foregoing language clearly suggests that the burden before the commission of showing the existence of alternatives superior to the course proposed by the applicant utility was on plaintiffs, and they clearly did not sustain that burden.

For all of the foregoing reasons, the appeal from the order of the public utilities commission dated October 30, 1967, in its Docket No. 10665, is dismissed.